IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 11-4015-01/02-CR-C-NKL |
| | ) | |
| ANDREW DAVID BRANDWEIN, | ) | |
| DEBRA LOUISE BRANDWEIN, | ) | |
| | ) | |
| Defendants. | ) | |

**REPORT AND RECOMMENDATION**

Defendants Andrew David Brandwein and Debra Louise Brandwein have each filed motions to suppress physical evidence seized by law enforcement officials during a search of their residence located at 2943 Route J, in Cole County, Missouri, on January 8, 2011. Defendants further seek suppression of any statements, confessions, or admissions they may have made as a result of the alleged illegal search of their residence. (Docs. 33, 38.) The Government filed suggestions in opposition to defendants' motions to suppress. (Doc. 39.) Defendant Andrew Brandwein subsequently filed reply suggestions in support of his motion to suppress. (Doc. 47.)[1]

On February 6, 2012, the Court heard lengthy testimony from twelve witnesses relating to events occurring at defendants' residence on January 8, 2011.

Following the suppression hearing, the defendants and the Government each submitted supplemental suggestions and authority in support of their respective positions. (Docs. 52, 55, 56).

Defendants have both been charged with conspiring to attempt to manufacture methamphetamine, in violation of Title 21, United States Code, Sections 841(a)(1) and 846 (Count Two). Defendant Andrew Brandwein has been charged with being a felon in possession

---

[1]This case was referred to the undersigned United States Magistrate Judge for processing in accord with the Magistrate Act, 28 U.S.C. § 636, and L.R. 72.1.

of a firearm, in violation of Title 18, United States Code, Sections 922(g)(1) and 924(a)(2) (Count One). Defendant Debra Brandwein has been charged with being an unlawful user of controlled substances while in possession of firearms, in violation of Title 18, United States Code, Sections 922(g)(3) and 924(a)(2) (Count Three) and with tampering with evidence, in violation of Title 18, United States Code, Section 1512 (c) (Count Four).

### A. Factual Background

The residence at 2943 Route J in Cole County, Missouri, is located in a rural area and was being rented by defendants Andrew and Debra Brandwein. Two neighbors, Glenda and John Verslues, were driving by the Brandwein home on Route J on January 8, 2011 when they noticed a shed located behind the residence was on fire. They pulled into the driveway and could see that a pickup truck was located very close to the burning shed. They immediately called 911. Mr. Verslues knocked on the door of the residence loudly and called out to see if anyone was home. No one answered the door and Mr. Verslues could not see anything inside of the residence. Concerned that the pickup truck would catch on fire, Mr. Verslues opened the door to the truck and observed the keys were in the ignition. He also noticed a small dog inside of the truck. As he was moving the truck away from the fire, he noticed a rifle laying on the ground near the truck. The rifle was laying on the ground about four feet on the other side of a trailer parked next to the truck. Mr. Verslues did not believe the rifle could have been leaning against the truck. Mr. Verslues thought it was unusual that there was a rifle laying on the ground and a dog in the truck. Shortly thereafter, fire department personnel arrived.

According to the evidence, at 6:59 p.m., emergency personnel were dispatched to an active structure fire located at 2943 Route J in Cole County, Missouri. Personnel of the Osage County Fire Protection District responded, followed by Deputy Arthur Brown of the Cole County Sheriff's Department. Dispatch records reflect that Deputy Brown arrived on scene at approximately 7:15 p.m.

Upon arrival at the scene, Deputy Brown was advised by firefighter Barry Gipe of the Osage County Fire Protection District that fire personnel had learned a rifle had been found on the ground next to a truck that had been parked near the fire. Keys were found in the ignition by a neighbor and were used to move the truck away from the fire. They also noticed there was a

small dog in the back seat of the truck. Fire personnel had also attempted to contact the residents of the home but no one answered the door. Because of the suspicious circumstances, at 7:30 p.m., Deputy Brown placed a call to Sergeant Troy Thurman requesting that he respond to assist.

Sgt. Thurman arrived on the scene at approximately 7:45 p.m. Deputy Brown advised Sgt. Thurman of the information he received from fire personnel. Deputy Brown showed Sgt. Thurman the area where the rifle was located. In that area, Sgt. Thurman observed a log with a sandbag on top of it, in what appeared to be a makeshift firing range area. Sgt. Thurman next examined the truck that was originally located near the fire. Sgt. Thurman opened the passenger door and examined the rifle that was located inside, finding it to be loaded with a single .223-caliber rifle cartridge. Sgt. Thurman unloaded the firearm and placed it back on the passenger seat of the truck. Sgt. Thurman also removed the keys from the ignition of the truck.

Shortly thereafter, individuals believed by the deputies to be the owners/landlords of the property arrived on the scene and, according to the deputies, informed them that all of the automobiles parked on the property belonged to the residents of the property. Sgt Thurman had the following concerns at the time:

(1) there was a burning building on the premises which at that point had an unknown cause;

(2) there was a pickup truck with the keys in the ignition with an unattended small dog inside during winter;

(3) there was a loaded rifle found laying on the ground near the burning shed which Sgt. Thurman thought was very unusual;

(4) sirens and lights from numerous emergency vehicles were operating directly outside of the residence;

(5) attempts to make contact with the residents by knocking loudly on the door multiple times had been unsuccessful; and

(6) the officers believed all of the vehicles belonging to the residents were present on the property.

Sgt. Thurman, a fourteen-year veteran with the Cole County Sheriff's Department, testified he was very concerned there could be an injured person or persons, or perhaps bodies, inside the home and he was concerned about the welfare of the residents. Sgt. Thurman testified he was not conducting a drug investigation at the time and had no idea that Andrew Brandwein

3

had a criminal drug-trafficking record when he was on the scene or before he entered the residence. Sgt. Thurman did not run a criminal record check before he arrived at the Brandwein residence and he did not know who lived in the home before he arrived on the scene. Sgt. Thurman and Deputy Brown were both concerned for the safety of the residents and were worried that someone was seriously injured inside of the home or that a possible spouse on spouse murder-suicide may have occurred.

Based on these concerns, Sgt. Thurman and Deputy Brown again attempted to contact the residents of the home by knocking on the door loudly four or five times and announcing their presence. As before, no one came to the door. Sgt. Thurman and Deputy Brown decided to use the keys recovered from the ignition of the truck to unlock the door and enter the home.

The officers entered cautiously concerned they may find injured persons or bodies. Once inside the home, Sgt. Thurman observed in plain view on the dining room table multiple items of drug paraphernalia, including a digital scale, a baggie containing crushed powder, suspected pseudoephedrine pills, and various paraphernalia commonly used to ingest methamphetamine. As they made entry, Deputy Brown and Sgt. Thurman continued to announce their presence. In the living room, Sgt. Thurman observed five firearms in plain view next to a television stand. The officers heard a sound coming from the back room and Andrew Brandwein emerged from what was later determined to be the master bedroom. He was fully dressed and was wearing a coat, sweatshirt, heavy overalls, and boots. The officers noted that Mr. Brandwein was sweating profusely and appeared to be disoriented and confused. Mr. Brandwein asked if he could remove his coveralls, and Sgt. Thurman told him that he could. Mr. Brandwein stated that he did not know the fire department was on scene or that his shed was on fire. The officers were surprised by the answer since sirens and lights from numerous emergency vehicles had been activated when arriving at the scene. Sgt. Thurman asked Mr. Brandwein how that could have been possible and he replied that he was sick and had been sleeping. Mr. Brandwein further informed them that his wife, Debra Brandwein, had gone shopping.

The deputies next attempted to contact Ms. Brandwein on her cell phone, but there was no answer. Due to the circumstances and the fact that he was unable to reach Ms. Brandwein by phone, Sgt. Thurman became concerned for her safety. Sgt. Thurman contacted dispatch at the

4

Sheriff's Department and asked them to continue to attempt contact with Ms. Brandwein as well, but they were also unsuccessful in reaching her. At approximately 8:00 p.m., Detective Colin Murdick was dispatched to assist with the investigation. Shortly thereafter, Ms. Brandwein called the residence and she was informed of the fire.

     Det. Murdick arrived and met Sgt. Thurman and Deputy Brown at the residence. Det. Murdick observed in plain view on the table the burnt aluminum foil, several baggies with white residue, two razor blades, a clear jar with white residue, coffee filters, a digital scale, two packages of pseudoephedrine tablets, a clear pie plate, Alavert pills, containers of foil, and a straw and blue spoon with residue. Det. Murdick was then directed to the firearms sitting in plain view on the floor next to a television stand in the living room. It was during this time that Det. Murdick learned for the first time that Andrew Brandwein had prior state felony convictions for narcotics offenses and unlawful possession of a firearm.

     Det. Murdick went outside and walked back to the location of the fire scene and observed what he described as a large barn or shed near the rear of the residence. There was a partially burnt pseudoephedrine package on the ground near the burn pile and multiple canisters that had been punctured at both ends. In the area of the fire were several more burnt canisters which appeared to be Coleman fuel cans. Det. Murdick recognized these items as being consistent with methamphetamine manufacturing activity.

     Det. Murdick was then contacted by an officer and learned that Ms. Brandwein had arrived. Det. Murdick went to meet Ms. Brandwein. She was concerned about her husband and Det. Murdick assured her that no one was injured. Det. Murdick escorted Ms. Brandwein to her home. Det. Murdick brought Ms. Brandwein into the house so she could see that her husband was not injured. He also wanted Sgt. Thurman to witness the interview he intended to have with Ms. Brandwein. Det. Murdick conducted this interview outside of the residence and out of the presence of Mr. Brandwein. At this point, Det. Murdick did not suspect Ms. Brandwein of any misconduct and she was not under arrest. Det. Murdick advised Ms. Brandwein that he felt the barn fire may have been caused by a methamphetamine lab and asked if she knew if Mr. Brandwein used or manufactured methamphetamine. Ms. Brandwein stated that her husband had recently started using methamphetamine again, but she had no idea if he was making

methamphetamine. Ms. Brandwein asked if they could go back inside the home to continue the conversation because it was very cold outside. They went inside the residence and continued the interview in the kitchen. Mr. Brandwein was still located in the living room.

While interviewing Ms. Brandwein in the kitchen, Det. Murdick noticed two large clear glass jars on a counter that contained a white residue that the officers believed to be methamphetamine. Ms. Brandwein denied knowing what was in the jars. Det. Murdick then informed both Andrew and Debra Brandwein that he was securing their residence and was going to apply for a search warrant. Ms. Brandwein was informed that she was free to leave if she wanted. However, she asked to stay with her husband in the living room. The officers agreed to her request to remain. Ms. Brandwein was instructed that she was not to touch anything, and was specifically advised not to touch the jars in the kitchen because they were believed to contain methamphetamine. While Det. Murdick was speaking with Ms. Brandwein, Deputy Brown conducted a search of Mr. Brandwein. He located several .223 shells and $2,458.00 in U.S. currency in Mr. Brandwein's pants pockets. Deputy Brown remained in the room with the Brandweins while Sgt. Thurman stepped outside.

Det. Murdick left the residence and contacted Sgt. Shannon Jeffries with the MUSTANG Drug Task Force and requested his assistance. Sgt. Jeffries arrived at approximately 9:00 p.m. and Det. Murdick showed him the items found outside of the residence which were indicative of methamphetamine manufacturing. Det. Murdick and Sgt. Jeffries entered the residence and asked Ms. Brandwein to step back outside. Sgt. Thurman was also present. Sgt. Jeffries asked Ms. Brandwein for permission to search the residence for illegal items. Ms. Brandwein asked why they wanted to search the residence and Sgt. Jeffries informed her that the officers had located items associated with manufacturing methamphetamine and wanted to determine if there were any other illegal items inside the home. Both Det. Murdick and Sgt. Jeffries each testified that Ms. Brandwein gave the officers permission to search. Ms. Brandwein testified that she did not give the officers permission to search.

Det. Murdick next walked into the kitchen and noticed that the two large glass jars that had contained the white residue were now in the sink and had been washed. Det. Murdick learned from Deputy Brown that he had allowed Ms. Brandwein into the kitchen to get a glass of

6

Case 2:11-cr-04015-BCW   Document 58   Filed 05/24/12   Page 6 of 19

water while Det. Murdick was outside.  Deputy Brown said he was not aware of the jars on the counter and that no one else other than Ms. Brandwein had entered the kitchen.  Ms. Brandwein was then placed under arrest for suspicion of tampering with evidence.  All of the narcotics-related items found inside the home were seized as evidence.  Sgt. Jeffries also located a burned pseudoephedrine package on the ground next to an outbuilding, a pill grinder in a window of the outbuilding, and lithium batteries in the bathroom and the kitchen.  These items were also seized as evidence.

After being advised of his <u>Miranda</u> rights, Andrew Brandwein allegedly made incriminating statements both while still at his home and later at the Cole County Jail.  Mr. Brandwein admitted that his wife Debra had dumped out the methamphetamine oil in the glass jars in the kitchen and then washed the jars in an effort to protect him.  He also admitted manufacturing methamphetamine at his home, that he was a daily user, and that he had been cooking methamphetamine off and on since he was 21 years old.  He admitted that all of the narcotics-related items found in the residence belonged to him.  He also admitted that he owned one of the rifles found in the residence and knew that it was illegal for him to possess the firearm because of his prior felony convictions.

Debra Brandwein was also interviewed at the Cole County Jail after being advised of her <u>Miranda</u> rights.  Ms. Brandwein admitted she had dumped the methamphetamine oil in the sink and washed the glass jars in the kitchen.  She admitted she knew they contained methamphetamine and did so in order to protect her husband.  She also admitted that she was a methamphetamine user.  She told investigators that her husband owned several of the firearms recovered and that he had received the firearms from customers in exchange for methamphetamine.  She also admitted she owned several of the firearms found in the home.

Defendants called several neighbors of the Brandweins and the owners/landlords of the property to testify concerning the events of the early evening of January 8, 2011.  Glenda Verslues and other neighbors testified it was a common practice for people in rural areas to leave car keys in their vehicles.  Ms. Verslues testified that when she arrived she anticipated that the keys might still be in the ignition of the pickup truck parked next to the burning shed.  As a result, her husband was able to move the truck away from the fire.  Neighbors testified they did

7

not observe any evidence which would suggest that someone inside of the house might be injured. They did not see any signs of a struggle and the residence seemed dark, quiet, and unoccupied. There were no voices or noises coming from the home and there were no signs of movement inside of the home. Several of the neighbors thought that since one of the Brandwein vehicles was missing that perhaps the Brandweins had simply gone out to dinner. However, investigators testified they were informed by one of the owners of the property that all of the vehicles on the property belonged to the Brandweins and were unaware that one of the vehicles was missing. Consequently, both Sgt. Thurman and Deputy Brown were very concerned for the welfare of the residents of the home and assumed or suspected they were likely inside and possibly deceased or injured.

## B. Discussion

Defendants have requested the Court to enter an order suppressing all physical evidence derived from the search of their home located at 2943 Route J in Cole County, Missouri, on January 8, 2011. Defendants further request suppression of any alleged incriminating statements made by them to law enforcement officials during and following the search of their home as "fruit of the poisonous tree." Defendants allege a violation of their rights under the Fourth, Fifth, and Fourteenth Amendments of the United States Constitution. The Government disagrees and asserts that exigent circumstances existed to justify a warrantless entry into the Brandwein home. The Government also asserts that the officers were acting as "community caretakers" when they entered the home because they reasonably believed someone may have been injured inside of the home and that an emergency existed and, therefore, entry was justified.

### 1. Exigent Circumstances Analysis

The primary issue before the Court is whether Deputy Brown and Sgt. Thurman were justified in making entry into the defendants' residence without first obtaining a search warrant. "When the government enters a defendant's home without a warrant, we presume that the search was unreasonable and therefore in violation of the Fourth Amendment." United States v. Valencia, 499 F.3d 813, 815 (8th Cir. 2007). However, this presumption may be rebutted by a showing that exigent circumstances exist to justify a warrantless entry. Id. "'One exigency obviating the requirement of a warrant is the need to assist persons who are seriously injured or

8

Case 2:11-cr-04015-BCW   Document 58   Filed 05/24/12   Page 8 of 19

threatened with such injury.' Brigham City, Utah v. Stuart, 547 U.S. 398, 403 (2006). A search under the exigent circumstances doctrine is reasonable 'as long as the circumstances, viewed *objectively*, justify [it].' Id. at 403 (quotation omitted). The searching officers' subjective motivations are irrelevant. Id." Id.

The text of the Fourth Amendment does not specify when a search warrant must be obtained; however, the Supreme Court has inferred that a warrant must generally be secured. Kentucky v. King, 131 S. Ct. 1849, 1856 (2011). It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable. Id. However, this presumption may be overcome in some circumstances because "[t]he ultimate touchstone of the Fourth Amendment is 'reasonableness.'" Id. Thus, the warrant requirement is subject to certain reasonable exceptions. Id.

One well-recognized exception applies when the exigencies of the situation make the needs of law enforcement so compelling that a warrantless search is objectively reasonable under the Fourth Amendment. Id. See also Mincey v. Arizona, 437 U.S. 385, 394 (1978); Payton v. New York, 445 U.S. 573, 590 (1980) ("[T]he Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant."). A legitimate concern for officer safety or the safety of others may constitute an exigent circumstance, and a warrantless entry into a residence may be justified if an officer has a reasonable fear of harm. United States v. Poe, 462 F.3d 997, 1000 (8th Cir 2006). See also United States v. Hill, 430 F.3d 939, 941 (8th Cir. 2005).

In Michigan v. Fisher, 130 S. Ct. 546 (2009), the Court held that under the "emergency aid exception" to the warrant requirement, law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury. The Court further held the "emergency aid exception" to the warrant requirement does not depend on the officers' subjective intent or the seriousness of any crime they are investigating when the emergency arises; it requires only an objectively reasonable basis for believing that a person within the house is in need of immediate aid. Id. at 548.

The parties have extensively briefed the law on the exigent circumstances exception to the warrant requirement. The Court has also spent considerable time researching the issue.

9

Neither the parties nor the Court could locate an opinion with facts similar to those of this case. It is worth noting that all cases where a court has found that an exigent circumstance existed appear to share two common factors. First, in all of the cases in which courts found exigency, officers observed events obviously occurring within the residence or building. For example, cries for help, screams, loud noises, or an observation of a struggle or fight within the structure by looking through a window. Second, courts have found exigent circumstances exist when officers observed events or evidence leading directly to a structure. For example, a blood trail leading to a closed door. See e.g. Michigan v. Fisher, Id. at 548-50 (exigent circumstances justified warrantless entry of house when officers saw recently injured person and heard violent noises coming from inside; because officer heard screams coming from the house and had been told by 911 operator that violence might be occurring); United States v. Klump, 536 F.3d 113, 118 (2nd Cir. 2008) (search of warehouse justified because police were investigating "odor of something burning" and developed a reasonable belief that a fire was burning inside a building); United States v. Lenoir, 318 F.3d. 725, 730 (7th Cir., 2003) (home entry justified where officers observed a drunk man wielding a shotgun and assault rifle retreat into a home). In these cases, the situation the officers encountered necessitated immediate or near-immediate action. See e.g. Michigan v. Tyler, 436 U.S. 499, 509 (1978) ("it would defy reason to suppose that firemen must secure a warrant or consent before entering a burning structure to put out a blaze.").

Here, while there were a series of very suspicious circumstances occurring on the property outside of the defendants' residence, the factors common in these other exigent circumstances cases were not present. There were no signs or sounds of distress coming from inside the home or evidence leading directly to the structure.

The Court does not believe Deputy Brown and Sgt. Thurman were covertly undertaking a narcotics investigation of the Brandweins prior to their entry into the home. The officers did not know Andrew Brandwein had a prior criminal record for narcotics trafficking. There is no evidence that a criminal records check or NCIC check had been conducted prior to the arrival of the officers on the scene or while they were at the scene. The Court believes the officers' testimony that they entered the home out of concern that someone inside may have been seriously injured. In other words, the motives of the officers were pure and this was not a pretextual

10

search. They had a very real belief that someone inside may be injured or in trouble and that an emergency situation existed requiring their assistance. There is no evidence indicating otherwise.

Defendants have attempted to offer innocent explanations for the suspicious circumstances occurring outside of the residence. For example, some of the neighbors and owners of the property testified it was not unusual for people living in rural areas to leave keys in their vehicles, or that the burning structure behind the home was just a simple, unattended shed fire, or that it was common to find loaded rifles laying on the ground next to what appeared to be a shooting range. The Court is not persuaded by these arguments. What is relevant to the inquiry is what the *officers* reasonably believed, not the neighbors. See Mincey, 437 U.S. at 392-93; Maryland v. Buie, 494 U.S. 325, 336-37 (1990). Here, Deputy Brown and Sgt. Thurman of the Cole County Sheriff's Department were aware of the following information before entering the defendants' home:

(1) There was a burning building/shed on the property near the rear of the home with an unknown origin;

(2) there was a pickup truck that had been parked next to the burning building with the keys in the ignition and a small dog inside during the cold of the winter;

(3) there was a loaded rifle found laying on the ground near the burning shed which Sgt. Thurman thought was very unusual;

(4) sirens and lights from numerous emergency vehicles were operating just outside of the residence;

(5) several attempts had been made to locate the residents by emergency and civilian personnel by knocking loudly on the door of the home; and

(6) the officers believed all of the vehicles located on the property were present on property.

Under these circumstances, the Court finds it was objectively reasonable for the officers to believe that someone inside of the home may have been seriously injured or may have been the victim of a violent crime. However, because there was no evidence leading directly into the home, such as a trail of blood, and there were no noises, voices or screams leading officers to believe someone inside may be in immediate distress or in need of protection, the Court does not believe probable cause existed for officers to enter and search the home. Consequently,

11

traditional "exigent circumstances" authority where officers were clearly investigating criminal activity is not particularly on point.

## 2. "Community Caretaker" Analysis

In United States v. Quezada, 448 F.3d 1005 (8th Cir. 2006), the Eighth Circuit considered facts less compelling than the facts in this case in affirming District Judge Ortrie Smith's denial of a motion to suppress. In Quezada, a deputy went to a residence to serve civil papers. When the deputy knocked on the door, the door opened partially and the deputy could see that the lights were turned on and could hear sounds coming from a television. The deputy announced his presence several times and no response was received. On those facts alone, the deputy made entry into the residence, ultimately discovering Quezada lying on the floor with a shotgun protruding from beneath his body. Id. at 1006. Quezada was later charged with being a felon in possession of a firearm. In considering whether these facts supported the deputy's warrantless entry into a residence, the court discussed the different standards governing entry into a residence by an officer acting as a "community caretaker," as opposed to an officer making entry to investigate a crime:

> We note at the outset that there is a difference between the standards that apply when an officer makes a warrantless entry when acting as a so-called community caretaker and when he or she makes a warrantless entry to investigate a crime. Police officers, unlike other public employees, tend to be 'jacks of all trades,' who often act in ways totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of criminal law. Cady v. Dombrowski, 413 U.S. 433, 441, 93 S. Ct. 2523, 37 L. Ed. 2d 706 (1973). These activities, which are undertaken to help those in danger and to protect property, are part of the officer's 'community caretaking functions.' Id. They are unrelated to the officer's duty to investigate and uncover criminal activity. A police officer may enter a residence without a warrant as a community caretaker where the officer has *a reasonable belief that an emergency exists* requiring his or her attention. Mincey v. Arizona, 437 U.S. 385, 392-93, 98 S. Ct. 2408, 57 L. Ed. 2d 290 (1978).... The Supreme Court has held that reasonable belief, the standard used when determining whether an officer may enter as a community caretaker, see Mincey, 437 U.S. at 392-93, 98 S. Ct. 2408, is a less exacting standard than probable cause. Maryland v. Buie, 494 U.S. 325, 336-37, 110 S. Ct. 1093, 108 L. Ed. 2d 276 (1990).

Id. at 1007 (emphasis added).

After analyzing the deputy's actions, the court found that the deputy had a reasonable belief that "someone was inside but was unable to respond for some reason." Id. at 1008.

12

The Eighth Circuit further noted in Quezada as follows:

> The Supreme Court has held that reasonable belief, the standard used when determining whether an officer may enter as a community caretaker, see Mincey, 437 U.S. at 392–93, 98 S. Ct. 2408, is a less exacting standard than probable cause. Maryland v. Buie, 494 U.S. 325, 336–37, 110 S. Ct. 1093, 108 L. Ed. 2d 276 (1990). This has led to some concern that a police officer might use his or her caretaking responsibilities as a pretext for entering a residence. The Ninth Circuit, therefore, has held that to justify an entry like the one in the present case an officer must have actually believed that an emergency existed and the belief must have primarily motivated his or her actions. See United States v. Cervantes, 219 F.3d 882, 890 (9th Cir.2000), cert. denied, 532 U.S. 912, 121 S. Ct. 1242, 149 L. Ed. 2d 150 (2001). This is contrary to the principle applicable when an entry is justified by probable cause to believe that a violation of law has occurred or is occurring; in those situations, the subjective intent of the officer is immaterial, see Whren v. United States, 517 U.S. 806, 813, 116 S. Ct. 1769, 135 L. Ed. 2d 89 (1996).

Id. at 1007.

As mentioned above in factors (1) through (6), the Court believes Sgt. Thurman and Deputy Brown had an objectively reasonable basis to believe that someone was likely present inside of the home and either seriously injured and in need of assistance or possibly deceased. Under the circumstances as they existed that evening, it would have been unreasonable for the officers not to take the readily available car keys that were left in the truck to unlock the door to the defendants' home to determine if anyone inside was hurt. In addition, at the time of entry, the officers were not conducting an investigation of drug activity. At this point, it was not a criminal investigation. After hearing the testimony of the officers, the Court believes they were acting in their role as "community caretakers."

While no activity or noise was observed coming from the residence by anyone, under the circumstances it was reasonable for officers to focus on the residence as the most likely location to find an injured victim. Photographs presented during the suppression hearing demonstrated that the defendants' home is a located in a rural area. The only buildings on the premises were the burning shed, a barn next to the shed that was so close to the burning building that fire personnel were dousing it with water, and a rabbit hutch and shed where it would be highly unlikely for an injured person to be found. The most likely location to find any injured person was inside the residence. There were multiple attempts by a neighbor, fire personnel, and the officers, to arouse anyone inside of the home by knocking loudly on the door. The officers

13

reasonably concluded that if anyone were on the property, he or she would likely be found inside of the home. As a result, the officers decided to make entry.

Here, Sgt. Thurman and Deputy Brown legitimately and reasonably believed someone may have been in trouble inside of the home. There is no evidence they were engaging in a subterfuge in order to search defendants' home in an effort to find evidence of drug trafficking. Their conduct is that which law enforcement officials should be encouraged to engage in when confronted with the type of suspicious circumstances that existed in this case. Given a choice between making entry to verify whether an injured person within is in need of aid, and disregarding those concerns and departing the scene, law enforcement officials should be encouraged to protect the public and make entry.

The Court also notes the words of the Supreme Court relating to the purpose of the exclusionary rule:

> The deterrent purpose of the exclusionary rule necessarily assumes that the police have engaged in willful, or at the very least negligent, conduct which has deprived the defendant of some right. ... Where the official action was pursued in complete good faith, however, the deterrence rationale loses much of its force.

Michigan v. Tucker, 417 U.S. 433, 447 (1974). Here, the Court believes the officers were clearly acting in good faith.

Both defendants have also asserted that there was not a true emergency present here because there was a delay of approximately 30 to 45 minutes before the officers made the decision to unlock the door and search the home. The Court does not believe this is a persuasive argument. The record is clear that it took this amount of time for both Sgt. Thurman and Deputy Brown to conduct their preliminary investigation. The officers needed the time to assess the seriousness of the situation and arrive at their determination that there was a very reasonable possibility that one or both of the residents of the home were likely inside and in need of assistance. See e.g., United States v. Valencia, 499 F.3d 813, 816-17 (8th Cir. 2007) (30-minute delay); United States v. Jones, 635 F.2d 1357 (8th Cir. 1980) (one-hour delay); United States v. Boettger, 71 F.3d 1410 (8th Cir. 1995) (overnight delay).

### 3. Debra Brandwein's Consent to Search Residence

In her motion to suppress, defendant Debra Brandwein alleges she did not freely and voluntarily consent to a search of her residence. The Government argues that the facts and circumstances surrounding Debra Brandwein's decision to consent support a finding that her consent was, in fact, freely and voluntarily given and her constitutional rights were not violated.

In Schneckloth v. Bustamonte, 412 U.S. 218 (1973), the Court held that "when a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given." Id. at 222 (quoting Bumper v. North Carolina, 391 U.S. 543, 548 (1968)). This determination requires examination of the totality of the circumstances surrounding both the environment of the encounter and the nature of the consenting party. Schneckloth, 412 U.S. at 226; United States v. White, 81 F.3d 775, 780 (8th Cir. 1996). A number of factors may be considered by the court in determining voluntariness; however, such factors "should not be applied mechanically." United States v. Chaidez, 906 F.2d 377, 381 (8th Cir. 1990). The inquiry turns on the totality of the circumstances, which must demonstrate that "the police reasonably believe[d] the search to be consensual." United States v. Sanchez, 156 F.3d 875, 878 (8th Cir. 1998).

Here, following her initial conversation with Det. Murdick and Sgt. Thurman, Debra Brandwein was advised that the residence was going to be secured because Det. Murdick was going to apply for a search warrant. She was advised that she was free to leave, but instead she asked to stay with her husband, and was allowed to do so. After Det. Murdick and Sgt. Jeffries completed an additional investigation outside the residence, they decided to request consent to search. Three officers were present at the time consent was requested. Det. Murdick and Sgt. Jeffries participated in the conversation with Ms. Brandwein. Sgt. Thurman was present but testified he did not hear the conversation between Sgt. Jeffries and Ms. Brandwein. Det. Murdick corroborated the testimony of Sgt. Jeffries. Both testified that Ms. Brandwein consented to a search of her home. However, Ms. Brandwein testified and denied that she gave consent to search. The Court believes the testimony of the law enforcement officers on this disputed issue is more credible and truthful. Ms. Brandwein's credibility is suspect, particularly in light of the fact that she allegedly destroyed methamphetamine evidence in the kitchen by

15

washing two glass jars, after having been specifically instructed by officers not to touch anything. She did so in an effort to protect her husband prior to the search of the home.

Ms. Brandwein was not under arrest and, in fact, had previously been advised she was free to leave. No threats or promises were made in order to secure her consent. Sgt. Jeffries advised her why they wanted to search the residence, and Debra Brandwein unequivocally granted consent to search. Under a totality of the circumstances review, these facts support the conclusion that Debra Brandwein's consent was freely and voluntarily given, and that the searching officers "reasonably believe[d] the search to be consensual." Id.

While it is true that, following the initial contact with Ms. Brandwein, Det. Thurman advised both defendants that the residence would be secured while officers applied for a search warrant, there was no threat to obtain a search warrant. Even if there had been such a threat, that is not the end of the inquiry. "When a person consents to a search after officers state they will attempt to obtain a warrant if the person does not consent, the consent is not necessarily coerced. . . . Instead, an officer's threat to obtain a search warrant is a factor to be considered when examining the totality of the circumstances surrounding consent." United States v. Larson, 978 F.2d 1021, 1024 (8th Cir. 1992) (citations omitted). Under the totality of the circumstances, it is clear that even though the officers advised Ms. Brandwein some time before their conversation with her during which they requested consent to search that they were going to apply for a search warrant, this did not render her subsequent consent involuntary. The officers did not guarantee that a warrant would be granted, nor did they threaten to obtain a search warrant if she did not consent to a search. The Court finds that under the totality of the circumstances, Ms. Brandwein's consent was freely and voluntarily given, and the ensuing search was not a violation of either defendant's constitutional rights.

### 4. Statements of the Defendants

Both defendants have also requested that any statements they made be suppressed. Because the Court has determined that the search of the home was not unlawful and thus any statements made thereafter were not "fruit of the poisonous tree," it is now only necessary to decide whether the statements made by the defendants were custodial statements and, if so, whether the defendants were properly advised of their rights before they gave any statements.

Pursuant to Miranda v. Arizona, 384 U.S. 436 (1966), individuals who are in custody must first be advised of their rights prior to questioning. However, Miranda does not apply to noncustodial interviews.

> The question 'whether a suspect is 'in custody' is an objective inquiry.' J.D.B. v. North Carolina, 131 S. Ct. 2394, 2402 (2011). 'Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave,' Id. (quoting Thompson v. Keohane, 516 U.S. 99, 112, 116 S. Ct. 457, 133 L. Ed. 2d 383 (1995)), 'or in this case, to terminate the interrogation and cause the [officers] to leave,' [United States v.] New, 491 F.3d [369] at 373 [(8th Cir. 2007)]. 'Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve the ultimate inquiry: was there a formal arrest or restraint on freedom of movement of the degree associated with formal arrest.' J.D.B., 131 S. Ct. at 2402 (quoting Thompson, 516 U.S. at 112, 116 S. Ct. 457).

United States v. Lowen, 647 F.3d 863, 866-67 (8th Cir. 2011).

When Debra Brandwein arrived at the scene, she was concerned about the fire, and Det. Murdick assured her that no one was injured. Det. Murdick brought Ms. Brandwein into the house so she could see that Andrew Brandwein was not injured. He also wanted to have Sgt. Thurman witness the interview he intended to have with Ms. Brandwein. Det. Murdick conducted this interview outside the residence because he did not want Mr. Brandwein to be present. At this point in the investigation, Det. Murdick did not suspect Ms. Brandwein of any criminal activity, and she was not under arrest. Det. Murdick's questions to Ms. Brandwein were related to his suspicions that Mr. Brandwein was manufacturing methamphetamine. When Ms. Brandwein requested to go inside the home to continue the conversation because she was cold, the officers agreed. At this point, Ms. Brandwein was free to move without any restraint. When Det. Murdick noticed two large clear glass jars on a counter that contained a white residue that officers believed to be methamphetamine, he informed both defendants that he was securing their residence and was going to apply for a search warrant. Ms. Brandwein was told that she was free to leave. However, she asked to stay with her husband in the living room and the officers agreed to her request.

> "Rather than demarcate a limited set of relevant circumstances, we have required police officers and courts to 'examine all of the circumstances surrounding the

17

interrogation.' " J.D.B., 131 S. Ct. at 2402 (quoting Stansbury v. California, 511 U.S. 318, 322 (1994)). In the instant case, both the parties and the district court relied heavily on the six nonexclusive factors expounded by our court in United States v. Griffin, 922 F.2d 1343 (8th Cir.1990), for evaluating whether an individual is in custody for purposes of Miranda.

> These factors are:
>
> (1) [W]hether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or, (6) whether the suspect was placed under arrest at the termination of the questioning.

Griffin, 922 F.2d at 1349.

Lowen, 647 F.3d at 867.

"There is no requirement . . . that the Griffin analysis be followed ritualistically in every Miranda case." United States v. Czichray, 378 F.3d 822, 827 (8th Cir.2004). "When the factors are invoked, it is important to recall that they are not by any means exclusive, and that 'custody' cannot be resolved merely by counting up the number of factors on each side of the balance and rendering a decision accordingly." Id. at 827. "The ultimate inquiry must always be whether the defendant was restrained as though he were under formal arrest." Id. at 828; see also United States v. Michael Lebrun, 363 F.3d 715, 720 (8th Cir. 2004) (en banc).

Applying the Griffin factors here leads the Court to the conclusion that, under the totality of the circumstances, Ms. Brandwein's statements made at her home to Det. Murdick and Sgt. Thurman before she was placed under arrest were clearly noncustodial and freely and voluntarily made.

After she was arrested, Sgt. Jeffries and Det. Murdick interviewed Ms. Brandwein at the Cole County Jail. Both officers testified that Sgt. Jeffries advised Ms. Brandwein of her Miranda rights. Ms. Brandwein acknowledged she understood and she agreed to speak with the officers. At the conclusion of the oral interview, Ms. Brandwein provided a written statement on a form bearing an advice of rights consistent with Miranda, and a statement acknowledging that she

"knowingly and purposely" waived her rights and voluntarily made her written statement. Ms. Brandwein wrote her statement out by hand, and signed the form at 12:24 a.m. on January 9, 2011. This written statement was admitted into evidence at the suppression hearing. It is clear from the evidence, and the Court finds, that Ms. Brandwein's statement at the Cole County Jail was voluntarily given after she was advised of her Miranda rights.

Finally, Andrew Brandwein was interviewed on two separate occasions following his arrest. The initial interview occurred in his residence, and was conducted by Sgt. Jeffries alone. According to Sgt. Jeffries' written report and testimony at the hearing, he advised Mr. Brandwein of his Miranda rights prior to the first interview. A second interview was conducted at the Cole County Jail and it was conducted by Sgt. Jeffries and Det. Murdick. Both officers filed reports and testified that Sgt. Jeffries read the Miranda rights to Andrew Brandwein before any questions were asked. At the hearing, Mr. Brandwein did not dispute this testimony and there is no evidence suggesting that he did not voluntarily waive his Miranda rights. The Court finds that Mr. Brandwein's statements were freely and voluntarily given to the investigators.

IT IS, THEREFORE, RECOMMENDED that the motions of defendants Andrew Brandwein and Debra Brandwein to suppress be denied. (Docs. 33, 38.)

Counsel are reminded they have fourteen days from the date of receipt of a copy of this Report and Recommendation within which to file and serve objections. A failure to file and serve exceptions by this date shall bar an attack on appeal of the factual findings in the Report and Recommendation which are accepted or adopted by the district judge, except on the grounds of plain error or manifest injustice.

Dated this 24th day of May, 2012, at Jefferson City, Missouri.

/s/ *Matt J. Whitworth*
MATT J. WHITWORTH
United States Magistrate Judge